IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-03314-PAB-STV

JESSICA WEBER,

    Plaintiff,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTHERN COLORADO
UNIVERSITY OF NORTHERN COLORADO,[1]

    Defendant.

_____

**ORDER**
_____

This matter comes before the Court on the Motion to Dismiss Certain Claims in Plaintiff's Amended Complaint (ECF No. 17-1) [Docket No. 22]. Plaintiff Jessica Weber filed a response, Docket No. 25, and defendant Board of Trustees of the University of Northern Colorado ("UNC") filed a reply. Docket No. 27. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND[2]**

UNC hired Dr. Weber on February 20, 2017 as an assistant professor of accounting. Docket No. 17-1 at 2, 4, ¶¶ 3, 16. When she was hired, Dr. Weber asked Department Chair Pat Seaton if she could receive a "course release" during her first

---

[1] The caption of the amended complaint repeats the phrase "University of Northern Colorado." Docket No. 17 at 1. The phrase is also repeated in the original complaint. Docket No. 1 at 1.

[2] The following facts are taken from Dr. Weber's amended complaint, Docket No. 17-1, and are presumed true for the purpose of ruling on UNC's motion to dismiss unless otherwise noted.

year.  *Id.* at 10, ¶ 46.  The course release would have enabled Dr. Weber to teach one less course while she became acclimated to teaching at UNC.  *Id.*  Mr. Seaton responded that there was insufficient faculty coverage to grant her request.  *Id.*  One year later, UNC hired Philipp Schaberl as an accounting professor.  *Id.* at 10-11, ¶ 48.  At the time Professor Schaberl was hired, Mr. Seaton granted Professor Schaberl a course release, despite the number of faculty in the accounting department remaining unchanged.  *Id.*

UNC paid Professor Schaberl more than Dr. Weber for performing similar work.  *Id.* at 12, ¶ 59.  Specifically, prior to Dr. Weber's pay adjustment in April 2021, UNC paid Professor Schaberl $140,000 annually and paid Dr. Weber $135,000 annually.  *Id.*

When Professor Schaberl applied for tenure, a peer group prepared evaluations.  *Id.* at 11, ¶¶ 52-53.  The evaluations were submitted to a human resources specialist.  *Id.*, ¶ 52.  The HR specialist compiled the reviews anonymously, merged them to create one aggregate score, and made a tenure recommendation based on this aggregate score.  *Id.*  Dr. Weber did not receive the same process when she applied for tenure.  *Id.*, ¶ 53.

In December 2020, Sher Gibbs, the Dean of the Monfort College of Business at UNC, encouraged Dr. Weber to apply for tenure in 2021.  *Id.* at 5, ¶ 19.  Dr. Weber submitted her tenure application on January 4, 2021.  *Id.*, ¶ 20.  Three weeks after she submitted her application, Dr. Weber was notified by Mr. Seaton that additional faculty members needed to be located because there was an insufficient number of tenured professors available to review her application.  *Id.*, ¶ 21.  On January 23, 2021, the associate dean of accounting, Michael Martin, informed Dr. Weber that "other tenured

professors" had been selected to review Dr. Weber's application.  *Id.*, ¶ 23.  On January 25, 2021, Dr. Weber received peer reviews from male Professors Schaberl, Bill Wilcox, and either Vish Lyer or Milan Larson.  *Id.* at 6, ¶ 24.  These professors did not recommend Dr. Weber for promotion and tenure.  *Id.*  The next day, Associate Dean Martin called Dr. Weber and notified her that a female accounting professor would be reviewing her application and that her review would be added shortly.  *Id.*, ¶ 25.

Dr. Weber met in person with Dean Gibbs on January 27, 2021 "to discuss her disappointment in how women are treated in the Accounting Department and to explain how she disagreed with the peer evaluations provided by her two male colleagues Bill Wilcox and Philipp Schaberl."  *Id.*, ¶ 26.  Dr. Weber informed Dean Gibbs that she intended to hire an attorney to pursue UNC for gender discrimination.  *Id.*  Dean Gibbs asked Dr. Weber to wait until after the tenure process was complete because Dean Gibbs was adding two reviewers to consider her application, which could result in a favorable outcome.  *Id.*

When Dr. Weber attempted to respond to issues and concerns raised by the tenured professors, Dr. Weber had access to only three of the five reviews.[3]  *Id.*, ¶ 27.  Moreover, Dr. Weber saw that data from the five reviews had been compiled by HR Specialist Anne Huerter and that the reviewing professors now concluded that they would recommend Dr. Weber for tenure.  *Id.*  The next day, when Dr. Weber attempted

---

[3] The allegations in Dr. Weber's complaint appear to suggest that she had some form of digital access to her application through which she could review documents, complete "tasks," and check the status of her application.  *See* Docket No. 17-1 at 6-7, ¶¶ 27-28.  However, Dr. Weber's complaint does not make clear how she had access to the tenured professors' reviews or how she was expected to "respond" to them.

3

to respond to her reviews, she "noticed that the task had been removed and that the process was again sent back to the professors for another review." *Id.* at 6-7, ¶ 28.

When Dr. Weber asked Associate Dean Martin why the "task" of responding to the tenured professors' reviews was no longer available, Associate Dean Martin stated that the change occurred because he had to "go back in to upload all five reviews." *Id.* He stated that he would require an official "vote" from the five professors. *Id.* Dr. Weber expressed her disappointment to Associate Dean Martin that he had "recalled the HR Specialist's anonymous compilation and recommendation . . . and that he invented a new step designed to remove anonymity." *Id.* at 7, ¶ 29. On February 11, 2021, Associate Dean Martin emailed Dr. Weber's peers asking them to vote Yes or No on the issue of promotion and tenure. *Id.*, ¶ 30. Dr. Weber was informed by a tenured female accounting professor that this process was used only for Dr. Weber. *Id.* The process had not been used for Professor Schaberl, who had been recently promoted. *Id.* On February 16, 2021, Associate Dean Martin compiled the votes recommending Dr. Weber for tenure. *Id.*, ¶ 31. The results of the vote were three votes against tenure and two votes in favor of tenure. *Id.* Associate Dean Martin changed the conclusion to "No, we do not recommend Promotion & Tenure." *Id.*

On February 22, 2021, Dr. Weber appealed this recommendation to the tenure appeals committee. *Id.*, ¶ 32. The tenure appeals committee voted in favor of Dr. Weber's appeal on March 11, 2021. *Id.* at 8, ¶ 34. The tenure appeals committee noted that there were procedural issues with the way the tenured professors had reviewed Dr. Weber's application, namely, there were "inconsistent criteria used in the promotion and tenure evaluation process where even the faculty in the Accounting

4

Department seemed unsure as to which criteria to use." *Id.*, ¶ 35 (alterations omitted). The committee further noted that there had been a "lack of appropriate mentorship" and "mixed messages with respect to Dr. Weber's performance from the Dean and other faculty members." *Id.*, ¶ 36.

One month later, Dean Gibbs gave her support to Dr. Weber's application for tenure, stating, "given her accomplishments, I am happy to recommend Dr. Weber for tenure and promotion to associate professor." *Id.*, ¶ 37 (alterations omitted). That same month, Dr. Weber received two letters from Mark R. Anderson, Provost and Senior Vice President for Academic Affairs, notifying her that she would be recommended for approval for promotion and tenure to UNC's board of trustees. *Id.* at 9, ¶ 39. In the first letter, Provost Anderson gave Dr. Weber "Level IV" ratings for teaching, professional activity, and service. *Id.*, ¶ 41. In the second letter, sent three weeks later, Provost Anderson re-rated Dr. Weber, giving her a "Level IV" rating in the teaching category and "Level III" ratings in the professional activity and service categories. *Id.* at 9-10, ¶ 42. There were no substantive reasons given for Provost Anderson's revised letter or why he gave Dr. Weber lower ratings in professional activity and service. *Id.* at 10, ¶ 43. The board of trustees approved Dr. Weber's promotion and tenure on June 11, 2021. *Id.*, ¶ 44.

Dr. Weber was treated by a mental health professional for the emotional distress caused by UNC's handling of Dr. Weber's candidacy for tenure. *Id.* at 12, ¶ 62. In 2023, because of UNC's treatment of Dr. Weber, she was forced to take disability leave to seek counseling from her mental health provider and primary care provider. *Id.*, ¶ 63. While on leave in 2023, Dr. Weber received information from other female accounting

5

professors that UNC continued to treat female faculty differently from male faculty. *Id.* at 13, ¶ 64. Dr. Weber was "forced to resign" from her position with UNC on December 31, 2023. *Id.*, ¶ 65. Dr. Weber was unable to obtain medical clearance to return to work from her medical team due to the treatment she received from UNC. *Id.*, ¶¶ 65-66. Dr. Weber has not been able to find comparable work as an accounting professor in the state of Colorado. *Id.*, ¶ 67.

On November 27, 2024, Dr. Weber filed suit against UNC. Docket No. 1. On February 9, 2025, Dr. Weber amended her complaint. Docket No. 17-1. In her amended complaint, Dr. Weber brings four claims for relief – a claim of sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, a claim of retaliation in violation of Title VII, a claim of sex-based wage discrimination in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)), and a claim of retaliation in violation of the EPA. *Id.* at 13-17, ¶¶ 68-102.

On February 24, 2025, UNC filed a partial motion to dismiss. Docket No. 22. In its motion, UNC seeks to dismiss Dr. Weber's Title VII sex discrimination claim to the extent it is based on Dr. Weber's constructive discharge. *Id.* at 4. The motion seeks to dismiss Dr. Weber's other claims in their entirety. *Id.* at 8-14. Dr. Weber responded on March 18, 2025. Docket No. 25. UNC replied. Docket No. 27.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the

6

facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

### III. ANALYSIS

#### A. Title VII Discrimination Claim

UNC argues that Dr. Weber's first claim should be dismissed to the extent that it alleges that Dr. Weber was constructively discharged from her position as an accounting professor at UNC. Docket No. 22 at 4-5; *see also* Docket No. 17-1 at 13, ¶¶ 65-66 ("When Dr. Weber was unable to obtain medical clearance from her medical team because of the treatment she received from Defendant, she was forced to resign from her position on 31 December 2023. The Defendant's ongoing disparate treatment towards other female faculty members coupled with her inability to obtain medical clearance to return to work made Dr. Weber's resignation necessary."). Under Title VII, constructive discharge "occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015) (quoting *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 534 (10th Cir. 1998)). "To establish constructive discharge, a plaintiff must show that 'she had no other choice but to quit.'" *Id.* (quoting *Sandoval v. City of Boulder, Colo.,* 388 F.3d 1312, 1325 (10th Cir. 2004)). A plaintiff's "subjective views of the situation are irrelevant, and she must instead show the conditions of employment were objectively intolerable." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (citation, quotation, and alterations omitted). "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 761 (10th Cir. 2020) (citation omitted).

8

UNC argues that Dr. Weber has not plausibly alleged that her working conditions at UNC were so objectively intolerable that she was forced to resign. Docket No. 22 at 6. Specifically, UNC argues that Dr. Weber cannot reasonably rely on her allegations regarding her tenure process in 2021 as a basis for her constructive discharge in 2023. *Id.* at 7. Moreover, UNC asserts that the allegation that she heard from other professors that UNC continued to discriminate against female employees while she was on medical leave is insufficient to establish that Dr. Weber had no choice but to resign. *Id.* Although UNC does not challenge the sufficiency of Dr. Weber's pleading regarding her Title VII discrimination claim except to the extent that it can be construed to allege a constructive discharge claim, Docket No. 22 at 4-7, UNC's apprehension that Dr. Weber may be asserting such a claim is reasonable, given that Dr. Weber seeks front pay as part of her damages, which is a remedy available only if Dr. Weber was constructively discharged. *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236 (10th Cir. 2000) (an award of back pay or front pay under Title VII "is not available absent a showing of constructive discharge" (citing *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986)).

Dr. Weber does not directly respond to UNC's argument that she has failed to plausibly allege constructive discharge. *See* Docket No. 25. Instead, she argues that UNC's "focus on constructive discharge is misguided in that it is only a small portion of Plaintiff's complaint." *Id.* at 10. Dr. Weber maintains that her complaint "center[s] around the disparate treatment that she was subject to prior to being approved for tenure" and that she has plausibly alleged her Title VII sex discrimination claim based on these allegations. *Id.*

9

The Court agrees that the allegations in the complaint fail to plausibly allege that Dr. Weber was constructively discharged.  Dr. Weber alleges that, in 2023, she was forced to seek mental health treatment for the emotional distress caused by UNC's handling of her tenure application in 2021.  Docket No. 17-1 at 12, ¶ 63.  This allegation demonstrates that her medical leave was based on conduct by UNC that is unlikely to recur given that Dr. Weber was awarded tenure.  *Id.* at 10, ¶ 44.  The amended complaint includes no specifics regarding the conditions of Dr. Weber's employment in 2023 or why these conditions were so intolerable that Dr. Weber was forced to resign.  Dr. Weber's allegation that she heard from other female professors that UNC continued to disparately treat female faculty does not include any details as to what this disparate treatment was or how it could affect Dr. Weber.  *Id.* at 13, ¶ 64.  As such, Dr. Weber's allegations do not raise a plausible inference that her working conditions in 2023 were intolerable.

Finally, to the extent that Dr. Weber's allegations give rise to the inference that Dr. Weber feared that she would be treated differently for future promotions, this is not a basis for finding that she was constructively discharged.  The Tenth Circuit has held that a "denial of promotion, even if discriminatory, does not necessarily establish a reasonable person would have felt compelled to resign."  *Waggoner v. Frito-Lay, Inc.*, 2023 WL 2967693, at *7 (10th Cir. Apr. 17, 2023) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1265, 1270 (10th Cir. 2003); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1508, 1514 (10th Cir. 1997); *Muller v. U.S. Steel Corp.*, 509 F.2d 923, 929 (10th Cir. 1975)).  Here, Dr. Weber does not allege that, after receiving tenure, UNC failed to promote her or that she worried about not being promoted in the future; she only claims that her tenure

process was discriminatory and distressing. Moreover, the Tenth Circuit has held that humiliation based on being singled out for different treatment does not necessarily rise to the level of intolerable working conditions. *See Hiatt*, 858 F.3d at 1318 (citing *Sandoval*, 388 F.3d at 1325-26 (finding no constructive discharge when the plaintiff was humiliated due to an investigation into her management practices and reassigned to another position whose conditions were not objectively intolerable); *Sanchez*, 164 F.3d at 533-34 (finding no constructive discharge when the plaintiff was the "only teacher required to bring a doctor's note when she was sick")). The Court finds that Dr. Weber's first claim fails to plausibly allege that her working conditions at UNC in 2023 were objectively intolerable. Therefore, the Court will dismiss Dr. Weber's Title VII discrimination claim to the extent it is based on her constructive discharge.

### B.  Title VII Retaliation Claim

UNC argues that Dr. Weber has failed to plausibly allege that she was retaliated against for opposing her disparate treatment during the tenure application process. Docket No. 22 at 8. Title VII forbids retaliation against an employee because she has "opposed" any practice made unlawful by Title VII or because she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Where there is no direct evidence of retaliation, the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to retaliation claims brought under Title VII. *Singh v. Cordle*, 936 F.3d 1022, 1042 (10th Cir. 2019).[4] Under this analysis, a

---

[4] Because neither party argues that Dr. Weber's second claim involves direct evidence of retaliation, *see* Docket Nos. 22, 25, the Court will evaluate the claim under the *McDonnell Douglas* framework.

11

plaintiff must first make a *prima facie* case of retaliation. *Id.* To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in "protected opposition to discrimination;" (2) she suffered a "materially adverse" action; and (3) a "causal connection" existed between the protected activity and the materially adverse action. *Id.*; *see also Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021).

"The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). "A complaint raising a claim of discrimination does not need to conclusively establish a prima facie case of discrimination, but it must contain more than threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Bekkem v. Wilkie*, 915 F.3d 1258, 1274 (10th Cir. 2019) (citation, quotation, and alterations omitted). A "plaintiff must include enough context and detail to link the allegedly adverse employment action to a discriminatory or retaliatory motive with something besides sheer speculation." *Id.* at 1274-75 (citation and quotations omitted). That is, a "plaintiff should have—and must plead—at least some relevant information to make the claims plausible on their face." *Doe v. Sch. Dist. No. 1, Denver, Colo.,* 970 F.3d 1300, 1311 (10th Cir. 2020) (citation omitted).

UNC does not challenge that Dr. Weber has plausibly alleged that she engaged in protected activity during her January 27, 2021 meeting with Dean Gibbs "to discuss her disappointment in how women are treated in the Accounting Department." Docket No. 17-1 at 6, ¶ 26; Docket No. 22 at 8. Moreover, UNC appears to concede that Associate Dean Martin's decision to change the tenure application process and the

reviewing professors' decision not to recommend Dr. Weber for tenure could constitute materially adverse actions. Docket No. 22 at 8-9. However, UNC maintains that Dr. Weber has failed to plausibly allege that either of these actions was causally connected to Dr. Weber's opposition to UNC's discriminatory conduct discussed during her meeting with Dean Gibbs. *Id.* at 8. Specifically, UNC argues that "there are no allegations in the Amended Complaint that the peer committee or Associate Dean Martin knew of Plaintiff's alleged protected activity directed toward Dean Gibbs." *Id.*

"Section 2000e-3(a) bars retaliation by an employer only if it is because the employee has opposed any practice made an unlawful . . . by Title VII." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (quotation and alterations omitted). "An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Id.* at 1188-89 (citing *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir. 1993) ("plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity")); *see also McElroy v. Am. Fam. Ins.*, 630 F. App'x 847, 851 (10th Cir. 2015) (unpublished); *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) (collecting cases from other circuits holding that the decisionmaker must know plaintiff complained of discrimination).[5]

---

[5] Some courts consider an employer's awareness of the plaintiff's participation in protected activity to be an element of a prima facie case of retaliation. *See*, *e.g.*, *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 571 (S.D.N.Y. 2023) ("To establish a prima facie case of retaliation, the plaintiff must show that: (1) he was engaged in an activity protected under Title VII; (2) his employer was aware of his participation in the protected activity; (3) the employer took adverse action against him; and (4) a causal connection existed between the protected activity and the adverse action." (internal quotations and citation omitted)).

13

Dr. Weber responds that the allegations in the complaint give rise to the plausible inference that Associate Dean Martin knew of Dr. Weber's complaint to Dean Gibbs. Docket No. 25 at 12.  Dr. Weber argues that Associate Dean Martin was responsible for the review process for her tenure application.  *Id.* (citing Docket No. 17-1 at 5, ¶ 23). She maintains that, less than three weeks after she complained to Dean Gibbs, Associate Dean Martin and three male professors declined to recommend her for tenure.  *Id.* (citing Docket No. 17-1 at 7, ¶ 31).  Dr. Weber therefore contends that the temporal proximity between Associate Dean Martin's recommendation and her conversation with Dean Gibbs supports an inference of retaliatory intent.  *Id.*  Finally, she asserts that, "[b]ased on their titles within the business school, Dean Gibbs oversees the business school including the activities of Associate Dean Martin."  *Id.* at 12-13.

The Tenth Circuit has found that close temporal proximity between protected activity and an adverse action can establish causation.  *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1339 (10th Cir. 2025) (we "have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation" (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) ("For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action.").  However, Dr. Weber provides no support for the proposition that temporal proximity can be used to infer that an employer was aware of the protected activity.  Rather, Dr. Weber must plausibly allege facts that give rise to the

14

inference that Associate Dean Martin or the tenured professors who reviewed Dr. Weber's application knew of her protected activity.  Dr. Weber's sole support for this inference is that the title of Dean Gibbs's position indicates that she is a higher-ranking UNC official than Associate Dean Martin.  Docket No. 25 at 12-13.  Dr. Weber appears to suggest that this gives rise to the inference that Dean Gibbs supervised Associate Dean Martin's handling of the tenure review process, which in turn suggests that Dean Gibbs informed Associate Dean Martin about her meeting with Dr. Weber.  Dr. Weber's allegations and inferences regarding Dean Gibbs's supervision of Associate Dean Martin lack the "context and detail to link the allegedly adverse employment action to a . . . retaliatory motive," and are instead "sheer speculation."  *Bekkem*, 915 F.3d at 1274-75.  Therefore, the Court finds that Dr. Weber has failed to plausibly allege a causal connection between her protected activity and UNC's adverse employment actions against her.  Accordingly, the Court will dismiss Dr. Weber's Title VII retaliation claim.

### C. EPA Claims

UNC argues that both of Dr. Weber's EPA claims should be dismissed because they are barred by the statute of limitations.  Docket No. 22 at 9.  "The statute of limitations is an affirmative defense that must be raised by the defendant."  *Hererra v. City of Española,* 32 F.4th 980, 991 (10th Cir. 2022) (citation omitted).  Dismissal at the Rule 12(b)(6) stage based on the statute of limitations is appropriate if "allegations on the face of the complaint surrounding the date of accrual . . . 'make clear that the right sued upon has been extinguished.'"  *Id.* (quoting *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016)).

15

"The Equal Pay Act of 1963 ('EPA') amended the Fair Labor Standards Act ('FLSA') to address the negative effects of wage differentials based on sex." *Knox v. John Varvatos Enters. Inc.*, 282 F. Supp. 3d 644, 652 (S.D.N.Y. 2017) (citation and quotations omitted). "As part of the FLSA, the EPA utilizes the FLSA's enforcement mechanisms and employs its definitional provisions." *Id.* (citation omitted). EPA claims are also subject to the FLSA's statute of limitations. *See Weidenbach v. Casper-Natrona Cnty. Health Dep't*, 563 F. Supp. 3d 1170, 1177 (D. Wyo. 2021); *Santiago v. United States*, 107 Fed. Cl. 154, 158 (2012) ("The applicable statute of limitations for Equal Pay Act claims is found in the Fair Labor Standards Act, 29 U.S.C. § 255(a)."). Claims brought under the FLSA, including a wage discrimination claim brought under the EPA,

> shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a); *see also Weidenbach*, 563 F. Supp. 3d at 1177; *Lee v. Salazar*, 787 F. Supp. 2d 1267, 1285 (D. Utah 2011) ("The statute of limitations for the Equal Pay Act is two years, unless a plaintiff shows an employer acted willfully.").

UNC asserts that the statute of limitations on an EPA claim accrues "every time an allegedly insufficient paycheck is issued." Docket No. 22 at 9 (quoting *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1467 (10th Cir. 1992)); *see also Weidenbach*, 563 F. Supp. 3d at 1179 ("A violation of the Act thus occurs at the time the discriminatorily low wage is paid to the disfavored employee."). UNC states that the amended complaint identifies April 2021 as the last time UNC paid Dr. Weber less than Professor Schaberl. Docket No. 22 at 10 (citing Docket No. 17-1 at 12, ¶ 59 ("Prior to the Defendant's pay

16

adjustment to Dr. Weber's salary in April 2021, UNC paid Professor Schaberl $140,000 per year while it paid Dr. Weber $135,000.")).  UNC maintains that, even assuming that any violation by UNC of the EPA was willful, Dr. Weber's claims were not filed within the three-year statute of limitations because Dr. Weber did not file her complaint until November 27, 2024.[6]  *Id.*

Whether or not the face of the complaint makes clear that the statute of limitations has run, Dr. Weber acknowledges that she did not file her complaint within the three-year statute of limitations.  *See* Docket No. 25 at 13-15.  However, Dr. Weber maintains that the statute of limitations on her EPA claims should be equitably tolled.  *Id.* at 13-14.  As a general matter, the Supreme Court has held that "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [she] has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *see also Elmore v. Henderson*, 227 F.3d 1009, 1013 (7th Cir. 2000) ("The running of a statute of limitations can be equitably tolled when[,] through no fault of his own[,] the plaintiff was unable to sue within the limitations period but he sued as soon as he could.") (citations omitted).  Equitable tolling "applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control."  *Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1181 (D. Colo. 2012) (quoting *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th

---

[6] UNC states that Dr. Weber filed her complaint on December 2, 2024.  Docket No. 22 at 10.  December 2, 2024 was the date the summons was issued.  *See* Docket No. 5.  However, Dr. Weber filed her complaint on November 27, 2024.  *See* Docket No. 1.  The discrepancy in UNC's motion does not impact the Court's analysis.

17

Cir. 2000) (citing *Baldwin Cnty. Welcome Ctr. v. Brown,* 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."))).

Dr. Weber maintains that she diligently pursued all of her claims during the limitations period, but that delay in the Equal Employment Opportunity Commission ("EEOC") investigation into her Title VII claims prevented her from timely filing suit. Docket No. 25 at 13-14. Under Title VII, a plaintiff must exhaust her administrative remedies with the EEOC before bringing her claims in federal court. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1186 (10th Cir. 2018) (a plaintiff's failure to file a claim with EEOC subjects the claim to the affirmative defense of failure to exhaust administrative remedies). Dr. Weber states that she requested a right-to-sue letter from the EEOC in October 2023, but did not receive it until September 2024. Docket No. 25 at 14. Dr. Weber maintains that she filed her complaint soon after receiving her right-to-sue letter from the EEOC. *Id.* Although the length of time of EEOC's investigation into her Title VII claims may have been beyond her control, nothing prevented Dr. Weber from filing her EPA claims before the Title VII investigation concluded. Unlike Dr. Weber's Title VII claims, Dr. Weber's EPA claims do not require administrative exhaustion before filing suit. *See Culumber v. Morris Network of Miss., Inc.*, 2024 WL 3513496, at *3 n.3 (S.D. Miss. July 23, 2024) ("In contrast to causes of action brought under Title VII . . . , Equal Pay Act claims do not require exhaustion of administrative remedies." (quoting *Stith v. Perot Sys. Corp.*, 122 F. App'x 115, 119 (5th Cir. 2005) (unpublished)); *Cruz-Packer v. D.C.*, 539 F. Supp. 2d 181, 190 (D.D.C. 2008) ("the

18

Equal Pay Act do[es] not require a plaintiff to first exhaust administrative remedies before proceeding to court").

Dr. Weber argues that it would be inequitable to require her to file separate lawsuits, one for her EPA claims and the other for her Title VII claims, when her claims arise from the same conduct. *Id.* at 14-15. In particular, she maintains that filing separate cases for her EPA claims and Title VII claims would have resulted in additional legal fees and filing fees. *Id.* at 15.

Dr. Weber provides no support for the proposition that the expense of filing separate actions for her Title VII claims and her EPA claims constitutes extraordinary circumstances that prevented her from filing her EPA claims within the limitations period. Rather, courts have rejected similar arguments that the statute of limitations on EPA claims should be equitably tolled during Title VII investigations. *See Manko v. Deutsche Bank*, 2004 WL 574659, at *7 (S.D.N.Y. Mar. 22, 2004), *aff'd*, 354 F. App'x 559 (2d Cir. 2009) ("Plaintiff argues that the statute of limitations should be equitably tolled for the period of time that her complaint was under investigation by the NYSDHR and EEOC. However, plaintiff has presented no compelling circumstances as to why this should be the case. Equal Pay Act claims are not required to be administratively exhausted prior to filing suit, so there is no reason why plaintiff could not have filed these claims before the conclusion of the NYSDHR and EEOC investigations into her other claims."); *see also Weidenbach*, 563 F. Supp. 3d at 1178 ("the Equal Pay Act, unlike Title VII, has no requirement of filing administrative complaints and awaiting administrative conciliation efforts" (quoting *Washington Cnty. v. Gunther*, 452 U.S. 161, 175 n.14 (1981)); *Allen v. Magic Media, Inc.*, 2010 WL 4739748, at *8 (D. Kan. Nov. 16,

2010) (same). Therefore, the Court will not equitably toll the statute of limitations on Dr. Weber's EPA claims. Because Dr. Weber failed to file her EPA claims within the limitations period, the Court will dismiss her EPA claims.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion to Dismiss Certain Claims in Plaintiff's Amended Complaint (ECF No. 17-1) [Docket No. 22] is **GRANTED**. It is further

**ORDERED** that plaintiff's first claim for relief, to the extent the claim alleges that plaintiff was constructively discharged, is **DISMISSED without prejudice**. It is further

**ORDERED** that plaintiff's second claim for relief is **DISMISSED without prejudice**. It is further

**ORDERED** that plaintiff's third and fourth claims for relief are **DISMISSED with prejudice**.[7]

DATED September 3, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[7] "A dismissal based on the running of the statute of limitations is treated as dismissal with prejudice." *Gardner v. Schumacher*, 2023 WL 5352452, at *2 (D.N.M. Aug. 21, 2023), *aff'd*, 2024 WL 5199962 (10th Cir. Dec. 23, 2024) (citing *Rodriguez v. Colorado*, 521 F. App'x 670, 671 (10th Cir. 2013) (unpublished)).